No. 2--04--1221                                      filed: 7/19/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03--DV--1152 |
| JAMES F. MULVEY, | ) ) ) | Honorable Kenneth L. Popejoy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KAPALA delivered the opinion of the court:

A Du Page County jury found defendant, James F. Mulvey, guilty of two counts of domestic battery (720 ILCS 5/12--3.2(a) (West 2002)). Thereafter, the trial court sentenced defendant to terms of probation. Defendant appeals, contending that he is entitled to a new trial because the trial court erred in (1) refusing to instruct the jury on the affirmative defense of reasonable discipline of a child, (2) failing to sustain his objection to prior-inconsistent-statement testimony, and (3) failing to give a limiting instruction to the jury regarding prior inconsistent statements. We affirm the judgment of the circuit court of Du Page County.

I. FACTS

The complaint charged domestic battery (720 ILCS 5/12--3.2(a)(2) (West 2002)) in that on June 28, 2003, defendant "intentionally made physical contact of an insulting nature with Paul M. Buck, a family member of said defendant in that said defendant struck Paul M. Buck in the face with

his fist." Before trial, the State added a second count of domestic battery (720 ILCS 5/12--3.2(a)(1) (West 2002)), alleging that "defendant knowingly and without justification caused bodily harm to Paul Buck in that defendant struck Paul Buck in the head with his fist."

The cause was tried in September 2004. Teresa Ashleman testified that she and her five children, Paul, John, Patricia, Tim, and Peter, live with defendant. Defendant is the biological father of the four younger children and has been "acting father" to Paul since Paul was five years old. According to Ashleman, Paul is slightly "mentally retarded" with an intelligence quotient of 74. Paul also has epilepsy, attention deficit and hyperactivity disorders, and learning disabilities.

Ashleman explained that at approximately 8 p.m. on June 28, 2003, Tim and Paul were upstairs playing video games. Defendant ran upstairs, and Ashleman saw defendant back Paul up into the back bedroom. Ashleman ran into the bedroom, where she saw defendant kneeling on Paul and holding Paul's hands down on the bed. Ashleman pulled defendant off of Paul, and they all went downstairs. Paul went into the kitchen and took some crackers from 11-year-old John. John protested by yelling and throwing some Styrofoam cups at Paul. Defendant took Paul by the arm to escort Paul up the stairs. Paul sat or lay down on the stairs because he did not want to be escorted upstairs. Paul started kicking and hitting, and defendant tried to hold him down. Peter was sitting at the base of the stairs and "kind of got squashed" by defendant and Paul. Ashleman said that Paul may have accidentally kicked Peter. Ashleman said that she grabbed Peter and got him out of the way. At that point in Ashleman's testimony, the following exchange ensued:

> "[ASSISTANT STATE'S ATTORNEY]: Was the defendant hitting Paul?
>
> [ASHLEMAN]: He was holding him down on the stairs and--
>
> [ASSISTANT STATE'S ATTORNEY]: My question was, was he hitting him?
>
> [ASHLEMAN]: I don't believe he was hitting him.

[ASSISTANT STATE'S ATTORNEY]: Okay. He wasn't hitting him in the head?

[ASHLEMAN]: No. He was doing something like this, a motion like this, on his-- around his head, and his other hand was near his head.

[ASSISTANT STATE'S ATTORNEY]: Okay. Did the defendant ever grab Paul by the legs and pull him down the stairs?

[ASHLEMAN]: Yes he did. I did see that.

[ASSISTANT STATE'S ATTORNEY]: And did you ever see him punch Paul?

[ASHLEMAN]: I did not see him punch, no, I did not.

I thought that he had, but I did not see that.

* * *

[ASSISTANT STATE'S ATTORNEY]: But your testimony right now is that you never saw Jim punch Paul around the head and shoulder area?

[ASHLEMAN]: No. I thought that he was, I did think that he was."

Ashleman testified further that she pulled defendant off of Paul and stood between them. Ashleman pushed defendant backward and yelled at defendant because she was angry and wanted defendant to let her handle Paul. Next, Paul threw cracker crumbs in defendant's direction. Ashleman denied that, in response, defendant threw a punch past her toward Paul. Paul ran into the kitchen and when John refused to help Paul, Paul punched John. Paul was trying to exit the kitchen because defendant was coming after him. Ashleman grabbed defendant by the shirt, the shirt ripped, and defendant and Paul collided and went down onto the kitchen floor. Ashleman saw Paul's head hit the floor. Ashleman got scared and called 911. At that point in Ashleman's testimony, the following exchange ensued:

"[ASSISTANT STATE'S ATTORNEY]: Okay. Did you see Jim punch Paul in the head?

[ASHLEMAN]: No.

[ASSISTANT STATE'S ATTORNEY]: You didn't see him punch him in the head repeatedly?

[ASHLEMAN]: No. I believe I exaggerated.

[ASSISTANT STATE'S ATTORNEY]: Okay. That's not my question.

[ASHLEMAN]: Okay.

[ASSISTANT STATE'S ATTORNEY]: Did you ever ask Jim to get off of Paul?

[ASHLEMAN]: I did.

[ASSISTANT STATE'S ATTORNEY]: Were you afraid for Paul's life?

[ASHLEMAN]: I was afraid because he has epilepsy.

[ASSISTANT STATE'S ATTORNEY]: Were you afraid for his life?

[ASHLEMAN]: Not for his life.

* * *

[ASSISTANT STATE'S ATTORNEY]: You weren't afraid that the defendant was going to kill Paul?

* * *

[ASHLEMAN]: I was afraid enough to call the police."

Ashleman explained that as she called 911 defendant went outside to smoke a cigarette, and Paul went into the family room. When Warrenville officers arrived, Ashleman tried to tell Officer Ken Dawson what happened.

Ashleman identified the three-page written statement that she wrote and signed and gave to Dawson the day after the incident. Ashleman admitted that she wrote in her statement (1) that defendant was mad at Paul, so he held him down on the stairs "while he punched him on and around the head and shoulders"; (2) that after Paul threw what was left of his cracker at defendant, "[defendant] through [sic] a punch at Paul's head right past [her]"; (3) that after wrestling Paul to the kitchen floor, defendant "proceeded to punch Paul repeatedly in the head and around the shoulders with closed fists very hard"; (4) that she "begged [defendant] to get off of Paul and leave him alone"; and (5) that she "thought Paul would be killed." Ashleman also admitted that on June 28, 2003, she told the police that defendant punched Paul in the face with his fists several times during two separate incidents. Ashleman admitted further that she did not tell the police that Paul bit defendant.

Ashleman's written statement was admitted into evidence. It read:

"Paul took one of John's crackers and John protested by yelling and throwing a plastic cup at Paul. Paul was standing in the hallway with the cracker when Jim got off of the couch and came towards Paul. Jim said, 'that's it, you're going upstairs' and grabbed Paul's arms and tried to force Paul upstairs. Peter was sitting on the stairs and Paul's knees came down on Peter's head accidentally while Jim pushed Paul down on the stairs. I yelled, 'you're squashing Peter!' to both of them and I got Peter out from under Paul. Jim was now madder at Paul because of Peter getting hurt so he put one knee down on Paul to hold him down on the stairs while he punched him on and around the head and shoulders. I managed to pull Jim off of Paul but Paul was kicking Jim now so Jim pulled Paul down off of the stairs by his legs. Paul was lying on the floor behind me and Jim was standing in front of me. I was trying to reason with Jim to leave Paul alone while Paul was squeezing the back of my legs and trying to punch my legs because he was very upset. Paul managed to get up

behind me while I was talking loudly with Jim. From behind me, Paul threw what was left of his cracker at Jim and then Jim threw a punch at Paul's head right past me. Paul ran into the kitchen and got behind John and begged John to help him. Paul said, 'save me, save me' while his hands were on John's shoulders from behind. John said, 'no, I'm not going to help you, get away from me,' and tried to get Paul off of him. Paul then punched John hard on the temple once. John came out of the kitchen crying and holding his head. Jim then ran into the kitchen towards Paul with me grabbing his shirt by the collar trying to hold him back from Paul. Jim jumped on Paul in the kitchen and wrestled Paul to the floor, breaking a stove knob and turning the gas on with another knob in the fall. Jim proceeded to punch Paul repeatedly on the head and around the shoulders with closed fists very hard. I begged him to get off of Paul and leave him alone but I thought Paul would be killed because I could not pull Jim off of Paul either. I then called 911 and asked for police help immediately. During this time Paul was still under Jim getting hurt and punched. I saw Paul's head come up and slam down on the tile floor--back of his head. Then Jim finally got off of Paul and went outside where the police had arrived.

Teresa R. Ashleman."

On cross-examination, Ashleman said that after defendant was released from jail she noticed that there was skin missing from his finger and that there was a very bad bruise on his upper thigh near his groin. Ashleman also said that after the incident she telephoned the police station in an effort to change her written statement, but she claimed that the officers would not let her.

Dawson testified that he responded to the Mulvey residence on the evening in question. Dawson said that Ashleman was upset. At that point in the testimony the following exchange occurred:

"[ASSISTANT STATE'S ATTORNEY]: Did Teresa tell you that the defendant punched her son?

[DEFENSE COUNSEL]: Objection, your honor; hearsay.

[ASSISTANT STATE'S ATTORNEY]: Judge, I'm impeaching--perfecting my impeachment of the witness, Teresa Ashleman.  It's an exception to the hearsay rule.

THE COURT: Defense, your final word on it?

[DEFENSE COUNSEL]: Your Honor, she already testified.

As far as perfecting the impeachment, I need to be able to cross examine the witness regarding this particular statement.

I don't know what the officer is going to say.

If it's an out-of-court statement offered for the truth, it's hearsay.

THE COURT: The--

[ASSISTANT STATE'S ATTORNEY]: Judge--I'm sorry.  Procedurally--

THE COURT: The objection is overruled.  The question can stand.

You may answer the question, sir.

[OFFICER DAWSON]: Basically, when we walked in the door, she told us that her boyfriend beat up her retarded son.

[ASSISTANT STATE'S ATTORNEY]: And did she tell you that the defendant punched her son Paul?

[OFFICER DAWSON]: Yes.

[ASSISTANT STATE'S ATTORNEY]: Did she say he punched him several times?

[OFFICER DAWSON]: Yes.

[ASSISTANT STATE'S ATTORNEY]: Did she tell you that the defendant wrestled Paul to the ground and punched him in the head with a closed fist?

[DEFENSE COUNSEL]: Your Honor, I'm going to interpose a continuing objection to any statements that Teresa--

THE COURT: Your continued objection is noted for the record.

The objection is overruled. You may answer.

[OFFICER DAWSON]: Yes, she did.

[ASSISTANT STATE'S ATTORNEY]: Did she tell you that she was standing between the defendant and Paul when the defendant reached around her and punched the defendant--or Paul in the head?

[OFFICER DAWSON]: Yes she did.

[ASSISTANT STATE'S ATTORNEY]: Did she tell you that Paul ran towards his brother, John, for help and that John wouldn't help him?

[OFFICER DAWSON]: Correct.

[ASSISTANT STATE'S ATTORNEY]: And did she tell you that the defendant ran towards Paul in the kitchen and wrestled him to the ground?

[OFFICER DAWSON]: Yes.

[ASSISTANT STATE'S ATTORNEY]: Did she happen to tell you anything about the defendant having his finger bit?

[OFFICER DAWSON]: No, she did not.

[ASSISTANT STATE'S ATTORNEY]: Did she happen to tell you that her son, John, was punched by Paul and got knocked out?

[OFFICER DAWSON]: No, she did not.

[ASSISTANT STATE'S ATTORNEY]: Did she tell you that the defendant had--

[DEFENSE COUNSEL]: Your Honor, the State has already called Ms. Ashleman.

If they want to know what Ms. Ashleman told the police officer, they had the opportunity to ask that, but this police officer--

THE COURT: And they did ask her that and she did testify to that and he can confirm that.

Continue on. Objection is overruled.

[ASSISTANT STATE'S ATTORNEY]: Did she tell you that defendant was defending himself?

[OFFICER DAWSON]: No, she did not.

[ASSISTANT STATE'S ATTORNEY]: Did she tell you that Paul was the aggressor at any time?

[OFFICER DAWSON]: No, she did not.

[ASSISTANT STATE'S ATTORNEY]: Did she ever tell you that Paul was-- that Paul bit the defendant in the thigh?

[OFFICER DAWSON]: No, she did not.

* * *

[ASSISTANT STATE'S ATTORNEY]: Did Teresa tell you that she was scared for the safety of her children and she wasn't sure what the defendant would do?

[OFFICER DAWSON]: Yes, she did."

Dawson testified further that Paul was crying hysterically and had a bloody nose. Defendant admitted to Dawson that he hit Paul with a closed fist in the head and stomach. Defendant did not claim that he hit Paul in self-defense. After he and Dawson arrived at the police department,

defendant said that he needed medical attention because he thought that his hand was broken. Dawson observed defendant's hand and saw no bite marks or ripped skin.

At a pretrial hearing regarding Paul's competence to testify, it was established that he was born on July 24, 1984, attended the Clairwoods Academy for the mentally disabled, and reads and performs math at a fourth-grade level. After examining Paul, the trial judge determined that he was competent to testify at trial.

At trial, Paul testified to the following. Defendant is his stepfather. On June 28, 2003, his mother called the police and they came to his house. Paul did not remember what defendant did to him after defendant saw him hit John. After further questioning, Paul said that he did remember defendant telling him to go to his room and that he and defendant were wrestling. Paul said that defendant held him down, but he denied that defendant punched him. Paul explained that he bit defendant in order to get up. Paul said that he tripped over his two-year-old brother Peter by accident and defendant got mad. When Paul's mother got in between defendant and Paul, defendant reached around and hit Paul on the forehead. Paul said that he ran into the kitchen and asked his brother John for help. When John refused, Paul got mad and "knocked John out." Defendant saw Paul hit John. Defendant rushed at Paul in the kitchen. Defendant wrestled Paul down again and held him on the floor. Defendant was not hitting him. When Paul tried to get away, he hit his head on the floor and got a bloody nose.

On cross-examination, Paul agreed that he takes medication for behavioral problems but did not take his medication on the date of the incident. On the evening in question, he was upstairs playing video games with his five-year-old brother, Tim. He got mad at Tim and hit him. Defendant came into the room and told him to go to his room. Paul agreed further that he hit defendant with his chair. After his mother came into the room, Paul went downstairs and into the

kitchen, where he took some cheese and crackers from John. Defendant came into the kitchen, took him by the arm, and tried to take him upstairs. He ran to the stairs and fell on top of Peter. While defendant was grabbing Paul, his mother pulled one of defendant's arms away from him. At that point, Paul bit defendant's hand and did not let go for a while. He then ran to John and asked for his help. When John refused, Paul punched John in the head. Defendant grabbed hold of Paul and they fell to the floor. Paul hit his head on the stove as they fell. When his mother came in and tried to get defendant off of him, Paul bit defendant's leg hard. His mother called the police.

After the State rested its case, defendant made a motion for a directed verdict, which was denied. The defense called defendant's daughter, Patricia Mulvey, who testified that she saw the argument between Paul and defendant in the kitchen but did not see defendant punch Paul. Rather, defendant was holding Paul's hands back and defendant fell on top of Paul. Patricia also saw Paul run over Peter on the stairs. Patricia said that defendant grabbed Paul's elbow and lifted him off of Peter. Patricia saw defendant hold Paul down on the stairs and saw Paul bite defendant's finger.

Defendant testified that at approximately 8 p.m. on June 28, 2003, he saw Paul hit Tim as they were playing video games upstairs. Defendant told Paul to go to his room and Paul refused. After defendant tilted Paul out of his chair, Paul picked up another chair and swung it at defendant. Defendant said that he was able to block the blow and then grabbed the chair out of Paul's hands. Paul turned, ran into the back bedroom, and jumped onto the bed. Defendant said that he went after Paul while he yelled for Ashleman. While lying on the bed, Paul tried to kick defendant, so defendant went to Paul's side, grabbed his arms, and got on top of Paul on the bed. Defendant held Paul there until Ashleman arrived and then he released Paul and left the room.

Shortly thereafter Paul and Ashleman came downstairs. Paul went to the kitchen and grabbed some crackers away from John. John started to scream and threw a stack of cups at Paul.

Defendant told Paul to go to his room. Paul crushed the crackers and "tossed them." Defendant said that he reached out and took Paul by the arm and said, "upstairs now." While defendant attempted to lead Paul to the stairs, Paul pulled away and ran over Peter on his way up the stairs. When defendant bent down to pick up Peter, Paul kicked defendant and then Peter. Defendant immediately grabbed Paul's arms and lay on top of him so he would not kick Peter again. Ashleman came and took Peter out from underneath them and told defendant to get off of Paul. Defendant told Ashleman that he could not let Paul go. With that, Ashleman started to pull defendant and got one of his arms free. Paul took defendant's free arm and bit defendant's index finger as hard as he could. Ashleman got between defendant and Paul and told defendant to calm down. Defendant told Ashleman that he was not the one who needed to calm down. With that, Paul made a throwing motion and defendant reached for Paul's shirt. Defendant denied punching or attempting to punch Paul. Paul ran into the kitchen and "slugged [John] on the side of the head." Ashleman grabbed defendant's shirt as he tried to go into the kitchen. The shirt ripped and defendant proceeded into the kitchen. Defendant asked John if he was alright, and John went into the bathroom. According to defendant, when Paul started to run from the kitchen, defendant wrapped his arms around Paul in a "bear hug" and pushed Paul back towards the counter. Defendant was telling Paul to calm down but Paul kept trying to break loose. Defendant said that they started to slip and hit the stove on the way to the floor. Ashleman put her arms around defendant and pulled him up away from Paul. At that point, Paul had slid down between defendant's legs and "took a great big bite out of the inside of [defendant's] thigh." Defendant once again wrapped his arms around Paul. Ashleman got up and ran for the telephone. Paul was thrashing and kicking while Ashleman was yelling at defendant to let Paul go. Defendant told her that he could not let Paul go. Defendant explained that he could not let Paul go because Paul had just bit him, punched John, and kicked Peter. Defendant kept telling Paul to settle down.

Paul pulled away from defendant and hit his head hard on the floor. With that, Paul stopped fighting. Defendant asked Paul if he was okay, and Paul said yes. Defendant let Paul up and told him to go sit in the living room. Defendant went outside and had a cigarette.

Defendant denied punching Paul during the incident or telling a police officer that he punched Paul in the face with a closed fist. When asked why he did not tell the police that he was acting in self-defense, defendant said, "[t]hey would have taken Paul to jail. He was 18." When asked why he did not want Paul to go to jail, defendant said, "[h]e's retarded."

The trial court instructed the jury on the affirmative defenses of justifiable use of force in defense of one's self and in defense of others. The trial court refused to instruct the jury on the defense of justifiable use of force in imposing reasonable parental discipline of a child. After hearing closing arguments, the jury retired to deliberate and returned verdicts of guilty. Thereafter, the trial court denied defendant's posttrial motion for a new trial. The trial court sentenced defendant to concurrent terms of probation. Defendant timely appeals.

## II. ANALYSIS

### A. Jury Instruction on Reasonable Discipline of a Child

Defendant's first appellate contention is that the trial court erred in refusing to instruct the jury on the common-law defense of justifiable use of force in the reasonable parental discipline of a child. Defendant tendered a proposed nonpattern jury instruction that provided that "[a] parent is legally justified in using reasonable force when necessary as part of the reasonable discipline of a child." In support of this instruction, defendant cited People v. Roberts, 351 Ill. App. 3d 684 (2004), wherein the Fourth District deemed an identical jury instruction to be "an accurate, simple, brief, impartial, and nonargumentative statement of the law." Roberts, 351 Ill. App. 3d at 690.

The defense of justifiable use of force in imposing reasonable parental discipline of a child is deeply rooted in the common law of this state. See, e.g., People v. Ball, 58 Ill. 2d 36, 39 (1974); Fletcher v. People, 52 Ill. 395, 397 (1869); Roberts, 351 Ill. App. 3d at 688; In re F.W., 261 Ill. App. 3d 894, 898 (1994); People v. Sambo, 197 Ill. App. 3d 574, 580-81 (1990); People v. Tomlianovich, 161 Ill. App. 3d 241, 242 (1987); People v. Walker, 130 Ill. App. 3d 58, 60 (1985); People v. Virgin, 60 Ill. App. 3d 964, 968 (1978). Additionally, as pointed out by the Roberts court:

> "[T]he domestic battery statute refers to the definitions found in 'subsection (3) of section 112A--3 of the Code of Criminal Procedure of 1963.' 720 ILCS 5/12--3.2(a)(1) (West 2002) (referring to 725 ILCS 5/112A--3(3) (West 2002)). Subsection (1) of section 112A--3 defines 'abuse' to 'not include reasonable direction of a minor child by a parent or person in loco parentis.' 725 ILCS 5/112A--3(1) (West 2002)." Roberts, 351 Ill. App. 3d at 689.

The State does not take issue with the holding in Roberts but, rather, the State argues that the evidence presented at trial did not support giving the jury the instruction, because the evidence did not establish that defendant was Paul's parent or was in loco parentis or that Paul was a "child." We note that the trial court did not rely on either of these rationales in refusing to give the jury instruction at issue. Nevertheless, we may affirm the trial court on any basis that is supported by the record. People v. Dinelli, 217 Ill. 2d 387, 403 (2005). Because we agree that Paul was not a "child" for purposes of the defense, defendant was not entitled to the instruction regarding reasonable parental discipline of a child. Accordingly, we need not consider whether defendant was Paul's parent or was in loco parentis.

Where there is some evidence to support a defense instruction, the trial court's refusal to instruct the jury constitutes an abuse of discretion. People v. Hari, 218 Ill. 2d 275, 296 (2006). Very slight evidence upon a given theory of a case will warrant the giving of an instruction. Hari, 218 Ill.

2d at 296. However, in this case, defendant's alternative theory that he was using force justifiably in imposing reasonable parental discipline of a child was not available to him unless Paul was in fact a "child." The definition of the term "child" for purposes of the common-law defense of justifiable use of force in the reasonable parental discipline of a child is an issue of first impression in this state. This is a question of law, subject to de novo review. See People v. Caballes, 221 Ill. 2d 282, ___ (2006).

It is uncontroverted that Paul was 18 years old on the date in question. In fact, the incident occurred less than one month before Paul's nineteenth birthday. Citing Thornhill v. Midwest Physician Center of Orland Park, 337 Ill. App. 3d 1034, 1052 (2003), for the proposition that the age of majority in the State of Illinois is 18, the State takes the position that the term "child" for purposes of the defense means a child less than 18 years of age. In response, defendant argues that a person does not cease being a "child" of his parent merely because he reaches the age of majority. Thus, the State would have us hold that only parents of minor children, less than 18 years of age, can lawfully utilize reasonable corporal punishment to discipline their children and, in turn, have the benefit of the corresponding defense to a charge of criminal aggression against a child. On the other hand, defendant would have us hold that every parent can lawfully utilize reasonable corporal punishment to discipline his or her child, regardless of the child's age.

We agree with the State's position and hold that, for purposes of the common-law defense of justifiable use of force in the reasonable parental discipline of a child, the term "child" is limited to persons less than 18 years of age. Defendant's interpretation leads to unreasonable applications of the defense in situations involving parents and their adult offspring. Under such an interpretation, a 55-year-old father could lawfully utilize reasonable corporal punishment to discipline his 35-year-old daughter. Defendant cites no authority for the proposition that the defense is available to parents

charged with crimes of aggression against their adult offspring, nor has he convinced us to extend the parental corporal punishment defense to parents with children who are 18 years of age and older.

The State's interpretation, on the other hand, is consistent with the legislature's recognition of the privilege of reasonable parental discipline as it exists in other contexts. For example, in addressing domestic violence orders of protection, the legislature used the term "minor child" in excepting from the definition of "abuse" the reasonable direction of a minor child by a parent or person in loco parentis. See 725 ILCS 5/112A--3(1) (West 2002). Also, subsection (c) of the domestic battery statute requires defendants convicted of various offenses in the presence of a child to serve a mandatory minimum imprisonment of 10 days or perform 300 hours of community service, or both. 720 ILCS 5/12--3.2(c) (West 2002). That subsection further provides that " 'child' means a person under 18 years of age." 720 ILCS 5/12--3.2(c) (West Supp. 2005).

In addition, the facts of this case demonstrate that a parent's use of corporal punishment to correct the behavior of his or her adult children, as opposed to the utilization of an alternative form of discipline, can easily escalate into mutual combat. This form of domestic violence exposes the combatants, as well as the other inhabitants of the household, to serious physical and emotional harm. This heightened safety concern serves as a sound policy rationale for the denial of the defense of reasonable parental discipline of a child to parents charged with crimes of aggression against their adult children.

In sum, because Paul was not a "child" at the time defendant used force on him, we conclude that there was no evidence presented at trial warranting the proposed jury instruction on the justifiable use of force in the reasonable parental discipline of a child. Accordingly, we find no abuse of discretion in the trial court's refusal to give the jury defendant's proposed instruction.

## B. Prior-Inconsistent-Statement Testimony

Defendant's second appellate contention is that the trial court erred in failing to sustain his objection to Dawson's testimony regarding Ashleman's prior inconsistent oral statements. Defendant advances three arguments in support of this contention: (1) proof of Ashleman's prior inconsistent oral statements should have been foreclosed because her prior inconsistent written statement had already been proven, (2) the State did not lay the proper foundation for Dawson's testimony regarding Ashleman's prior inconsistent oral statements, and (3) Dawson's testimony regarding Ashleman's prior inconsistent oral statements was overly lengthy.

Defendant's arguments are waived, as defendant did not object at trial on these three specific bases or raise them in his posttrial motion. Defendant's trial objection to Dawson's testimony was on the basis of hearsay, and in his posttrial motion he wrote that "the Court erred in allowing Officer Dawson to testify to the hearsay statements of Teresa Ashleman." Both an objection at trial and inclusion of the alleged error in a written posttrial motion are necessary to preserve the error for review. People v. Enoch, 122 Ill. 2d 176, 186 (1988). A specific objection waives all other grounds. People v. O'Neal, 104 Ill. 2d 399, 407 (1984). The rule requiring a specific objection is especially appropriate where a defendant's lack of a timely and specific objection deprives the trial court of the ability to correct deficiencies in the foundational proof at trial. People v. Woods, 214 Ill. 2d 455, 470 (2005).

Waiver aside, assuming arguendo that the trial court erred in admitting Ashleman's prior inconsistent oral statements to Dawson, defendant has failed to establish that he suffered any prejudice, in light of the fact that Ashleman made nearly verbatim statements in her prior inconsistent written statement, which was admissible as substantive evidence pursuant to section 115--10.1(c)(2)(A) of the Code of Criminal Procedure of 1963. 725 ILCS 5/115--10.1(c)(2)(A)

(West 2002) (a prior inconsistent statement is substantively admissible where it narrates, describes, or explains an event or condition of which the witness had personal knowledge and is proved to have been written or signed by the witness). Because Ashleman's oral statements to Dawson were merely cumulative of other properly admitted testimony, any error in their admission was harmless. See People v. Bradford, 106 Ill. 2d 492, 500-01 (1985) (lack of proper foundation for prior inconsistent statement harmless given extent to which witnesses' testimony had already been impeached through another properly admitted prior inconsistent statement); People v. Sims, 285 Ill. App. 3d 598, 610 (1996) (the improper admission of a prior inconsistent statement made to police detectives was harmless because it was cumulative of witness's prior inconsistent statement before grand jury, which was properly admitted as substantive evidence under section 115--10.1(c)(1)). For these reasons, we cannot conclude that defendant is entitled to a new trial based on his second appellate contention.

## C. Limiting Instruction

Defendant's last appellate contention is that the trial court failed to give a limiting instruction regarding Ashleman's prior inconsistent oral statements. The State argues that Ashleman's prior inconsistent oral statements to Dawson were substantively admissible under section 115--10.1 (725 ILCS 5/115--10.1 (West 2002)) such that an instruction limiting the jury's consideration of those statements to impeachment only would have been inappropriate. However, even if defendant was entitled to such a limiting instruction, he waived his third appellate contention by not tendering a limiting instruction or raising the issue in his posttrial motion. A claim on appeal that the trial court erred in failing to give a limiting instruction with respect to the jury's consideration of a prior inconsistent statement is waived by a defendant's failure to tender a limiting instruction and raise the issue in a posttrial motion. People v. Gacho, 122 Ill. 2d 221, 253 (1988). In addition, defendant's

failure to request a limiting instruction left the jury with the capability to consider the evidence substantively.  In the absence of plain error, which defendant is not here asserting, if no request is made to have the jury advised that a prior inconsistent statement was admitted solely to impeach, the statements may be considered as substantive evidence by the jury.  People v. Camp, 128 Ill. App. 3d 223, 231 (1984); M. Graham, Cleary & Graham's Handbook of Illinois Evidence §613.3, at 501; §801.8, at 648 (8th ed. 2004).  Accordingly, defendant is not entitled to a new trial based on his last appellate contention.

III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

GROMETER, P.J., and BYRNE, J., concur.