2023 IL App (2d) 230142-U
No. 2-23-0142
Order filed December 27, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kendall County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-CF-310 |
| | ) | |
| ROBERT S. BARWICKI, | ) | Honorable |
| | ) | Robert P Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court properly refused a self-defense instruction in defendant's trial for aggravated battery of a peace officer where the evidence showed that defendant was the aggressor and pushed a corrections officer who was enforcing jail regulations by removing paper defendant had placed over the window on his cell door.

¶ 2    On the morning of February 6, 2022, defendant, Robert S. Barwicki, was an inmate at the Kendall County jail. Deputy Jonathan Hassler was working in the jail. Hassler noticed that defendant had covered the window on his cell door with a piece of paper. When Hassler attempted to remove the paper, defendant pushed Hassler in the face. Defendant was charged with aggravated

battery (720 ILCS 5/12-3.05(d)(4) (West 2020)). At his jury trial, defendant asked the trial court to instruct the jury on self-defense (see Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (4th ed. 2000)). The trial court refused. The jury found defendant guilty of aggravated battery. Defendant was sentenced to 30 months' probation. Defendant timely appeals, arguing that the court should have instructed the jury on self-defense. We disagree. Accordingly, we affirm.

¶ 3                               I. BACKGROUND

¶ 4      At trial, Hassler testified that, on February 6, 2022, he was working as a corrections officer at the Kendall County jail. The door to each jail cell had a glass window in the center. The window was there so that officers could check the inmates' well-being. Jail rules prohibited covering these cell windows because it endangered the safety of the inmates and jail personnel. Inmates were given a handbook detailing this and other rules.

¶ 5      At 5:15 a.m. on February 6, 2022, Hassler was conducting cell checks and collecting breakfast trays from the inmates in the jail. Hassler wore his uniform, which included an official patch, star badge, and radio. According to Hassler, the cells he checked were arranged in groups called pods. Defendant's cell was in a pod consisting of four cells. Unlike other cells in the pod, defendant's cell door was locked because "there was something else going on *** with [defendant] where he wasn't out with the other guys." Hassler observed that defendant's cell-door window was covered on the inside by paper. After opening defendant's cell door and retrieving defendant's breakfast tray, Hassler held the door open and talked to defendant, who spoke "broken English." Hassler first asked, then told, defendant to remove the paper covering the window. Defendant refused, telling Hassler that he was "on strike" and "they know what it means." Although Hassler knew that defendant had recently been relieved from his duties as a kitchen worker, Hassler "[did not] particularly know" what defendant meant by being "on strike."

¶ 6    Hassler reached his hand around the open cell door and "grabbed [the paper] off of the window." As Hassler attempted to close the door, defendant "put his hand in the way," preventing Hassler from closing the door. "[Defendant] immediately started pushing on the door to force his way out of the cell." While holding defendant's breakfast tray in his left hand, Hassler held on to the door with his right hand and attempted to brace his foot against the door. Hassler dropped defendant's breakfast tray on the floor and then used both hands to hold on to the door.

¶ 7    As Hassler pushed against the door, defendant reached his hand around the door and pushed Hassler in the face three or four times. The prescription eyeglasses Hassler was wearing were knocked off his face. Other corrections officers were summoned to assist. Eventually, defendant was restrained and put back in his cell.

¶ 8    Recordings from Hassler's body camera and the surveillance cameras at the jail were admitted at trial. The surveillance recording, which did not contain an audio component, showed the four cells in the pod. The pod was self-contained and secured. A keypad was on the frame of the door in the pod. After entering the pod, Hassler swiped his key card on the keypad, locking the door to the pod. An inmate from another cell was moving about the area, going in and out of his cell. Defendant's cell was nearest the door, and Hassler stood outside it. Hassler was wearing black shoes, black pants, a black utility belt, a black short-sleeved shirt with a large patch on the left sleeve, and a gold badge on the left chest area of his shirt. On the right chest area of his shirt was his radio. Once the cell door "was opened," defendant handed Hassler a food tray. Hassler took the tray with his right hand and transferred it to his left hand. Hassler then reached toward the paper covering the window on defendant's door and removed it. Defendant took the paper from Hassler. As Hassler began closing the door, defendant put the paper back over the window. Seeing defendant do this, Hassler partially reopened the door and talked to defendant. Hassler then

grabbed the paper from the window and attempted to close the door. Hassler was not able to close the door. Hassler pushed on the door with his right hand and right foot but still could not close the door. Defendant's fingers appeared on the edge of the door, indicating that he was pushing on the door. Hassler dropped the paper and the food tray and placed his right hand on the door. The door opened partway, and defendant's head was partly visible behind the door. Hassler reached his right arm into the cell, presumably to push defendant back from the door. Defendant reached his left hand out of the cell and grabbed Hassler's right arm. Defendant then used his left hand to push against Hassler's face. Defendant managed to push the cell door open and emerge from the cell. With his left hand, defendant appeared to grab Hassler's neck or collar. As Hassler stepped back, attempting to escape defendant's hold, he pulled defendant with him. Hassler grabbed defendant's left arm with his right hand and pulled it away from his neck or collar. With his left hand, Hassler first grabbed defendant's sweatshirt and then his right arm. They tussled as Hassler attempted to restrain defendant. Two other corrections officers appeared. They were dressed in uniforms just like Hassler's. A third inmate from another cell opened his cell door and watched what was transpiring. The officers restrained defendant and put him back in his cell.

¶ 9 Hassler's body camera recorded both audio and video components. As the body camera recording began, Hassler stood outside defendant's cell. Defendant said, "I'd like to find out." Hassler chuckled and called on his radio, "And when you're caught up, Eddie two-four, Eddie two-four." Hassler asked defendant to step back, and defendant told Hassler that he "need[ed] to clean the cell." Hassler told defendant, "That's gonna have to wait a bit." When defendant's cell door was unlocked remotely, Hassler opened the door. Defendant handed his food tray to Hassler, and Hassler said, "Thank you, sir." There was a sound of paper rustling, consistent with Hassler removing the paper from the cell-door window (which, according to the surveillance recording,

occurred at this point). Defendant, presumably referring to the paper, said, "Strike, you don't see that?" Hassler replied, "Hmm." Defendant continued, "So just leave it." Hassler responded, "Well, no, [be]cause then you're supposed to see." Defendant protested, saying, "No, no, no." There was more paper rustling, consistent with defendant placing the paper back on the window (which, according to the surveillance recording, happened at this point). Defendant then said, "This side's gonna be on strike, and they know it." Defendant continued, "It's gonna be like that." Defendant then snapped his fingers and said, "Exactly, and don't touch it, okay, please." Hassler responded, "Well, that's not going to happen." Defendant interjected, "They know why, they know why." In a calm voice, Hassler directed defendant to "take it down." Defendant, sounding agitated, responded, "I explained yesterday." Hassler interjected and again directed defendant in a calm voice to "take it down." Defendant replied, "It's not going to be taken down." Hassler said, "All right." As defendant explained his position, beginning with "That's why," there was a sound consistent with Hassler removing the paper from the cell window (which, according to the surveillance recording, occurred at this point). Hassler dropped the tray and immediately said, "No." Defendant's hands were on the edge of the door. The door fully opened, and defendant reached out to Hassler with both hands. Hassler did not touch defendant at this point. As defendant moved forward, Hassler grabbed the front of defendant's sweatshirt and said, "No." Defendant pushed himself out of the cell and asked, "You know how to fight, right?" Hassler again told defendant, "No." Defendant said, "Don't take it down." Two other corrections officers arrived, and defendant was restrained. Defendant said, "That how we do. He king. Maybe you start to talk, so."

¶ 10    Defendant, who testified with the help of a Polish interpreter, stated that he could understand simple English words. He never received a handbook detailing the jail's rules and

regulations. He admitted that, on the date in question, he had covered his cell-door window with a piece of paper bearing the word " 'Strike.' " He did so, he explained, because he wanted to talk to a corrections officer about being fired from the kitchen. Defendant agreed that his cell door was locked on that date, but he claimed that no one had told him why. However, defendant acknowledged that he had a physical altercation with his fellow inmates a few days before the incident. When asked if he had any physical contact with a corrections officer before the incident, defendant said, "Of course not."

¶ 11    Defendant testified that, when Hassler attempted to remove the paper from the window on his cell door, "[Hassler] didn't want to listen to [defendant]." Defendant "d[id]n't know if [Hassler] was upset or something." When Hassler attempted to close the cell door, defendant "just blocked the door" "[b]ecause [Hassler] turned down the sign." Defendant did not grab Hassler at this point. When Hassler could not close defendant's cell door, he "pulled [defendant] out [of his cell]." After that, defendant "d[id]n't know what [Hassler] wanted to do, he acted nervous." Defendant said that this caused him to be "afraid." Defendant explained that he "was hoping that [he] wasn't gonna die." He said he was "worried but [he] was praying that [Hassler] wasn't gonna do it." When asked if he shoved Hassler away from him because he was afraid that Hassler was going to harm him, defendant said, "Yes."

¶ 12    On cross-examination, defendant's testimony was equivocal and argumentative. He admitted that he understands English, but when asked if he understood what Hassler said to him "before [he] struck" Hassler, defendant asked, "[W]hy did [Hassler] say I struck him?" Defendant asserted that "[he] never struck [Hassler]." When defendant was asked if he remembered pushing Hassler in the face, he said, "No." When asked that question again, he said, "You can understand [pushing] in different ways." Then, when asked if "[his] hands touch[ed] Deputy Hassler to push

him away," he replied, "After he had touched me first." When asked why he thought he was "going to die" when Hassler pulled him out of his cell, defendant said that "[t]here were different events happening before proving that [Hassler] could do that." When asked if "[s]omebody had hurt [him] before," defendant responded, "Did I say it was about me?" Defendant was then questioned about whether he would have been "safe" if he had allowed Hassler to close the cell door. Defendant replied that he would not have been "safe," because "there was no violence before." Defendant continued, "Like why would I be, you know, I wasn't scared at that time." When asked how many times he pushed, struck, or hit Hassler, defendant responded, "None." Defendant also stated that he believed Hassler was "just a worker." Although he intimated that he knew Hassler had a badge, he asked, "What is the difference badge or no badge?" According to defendant, he did not know if Hassler was "a guard," "a cleaning person," or "a police officer."

¶ 13    After all the evidence was presented, defendant asked the trial court to instruct the jury on self-defense. Defendant claimed that the instruction was proper because he testified that he was pulled out of his cell, feared that Hassler was going to harm him, and pushed Hassler away to protect himself. The State objected, noting that defendant denied touching Hassler. The court refused to instruct the jury on self-defense, finding "that based on the testimony that was presented, there [was] not a basis for giving this instruction."

¶ 14    The jury found defendant guilty of aggravated battery. Defendant filed a posttrial motion, arguing, among other things, that the trial court erred when it refused to instruct the jury on self-defense. The court denied the motion.[1] Defendant was sentenced to 30 months' probation and 179 days in jail, all of which jail time he had already served.

---

[1]The record on appeal does not contain a transcript of the hearing on the posttrial motion

¶ 15     This timely appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17     At issue in this appeal is whether the trial court erred when it refused to instruct the jury on self-defense. Section 7-1(a) of the Criminal Code of 2012 (720 ILCS 5/7-1(a) (West 2020)) provides, in pertinent part, that a "person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." To obtain a jury instruction on self-defense, the defendant must establish "some evidence" on each of six elements: (1) force was threatened against the defendant, (2) the defendant was not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the defendant actually and subjectively believed a danger existed that required the use of the force applied, and (6) the defendant's beliefs were objectively reasonable. *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 44.

¶ 18     A defendant is entitled to a self-defense instruction "even if very slight or only some evidence exists to support the theory of self-defense." *Id.* ¶ 45. "In applying this [slight-evidence] test, the [trial] court must consider the evidence in the light most favorable to the defendant." *People v. Alexander*, 250 Ill. App. 3d 68, 76 (1993). " 'Evidence, however slight, supporting an affirmative defense entitles the defendant to an instruction [citations], even if the evidence is conflicting and the defendant's testimony is impeached.' " *People v. Sims*, 374 Ill. App. 3d 427, 432 (2007) (quoting *People v. Swartz*, 186 Ill. App. 3d 399, 401 (1989)). Similarly, "[s]uch evidence need not be credible as '[r]equiring that credible evidence exist in the record risks the trial court invading the function of the jury and substituting its own credibility determination for

_____

or an adequate substitute for the transcript. See Ill. S. Ct. R. 323(a), (c), (d) (eff. July 1, 2017).

that of the jury.' " *People v. French*, 2020 IL App (3d) 170220, ¶ 20 (quoting *People v. McDonald*, 2016 IL 118882, ¶ 25).

¶ 19     A self-defense instruction should not be given if the defendant fails to make the required evidentiary showing as to one or more of the six self-defense factors. See *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 56. Once a defendant satisfactorily raises self-defense, the burden shifts to the State to disprove self-defense beyond a reasonable doubt. *People v. Lee*, 213 Ill. 2d 218, 224 (2004).

¶ 20     When the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify a self-defense instruction, the proper standard of review is abuse of discretion. *McDonald*, 2016 IL 118882, ¶ 42. If "some" or "slight" evidence exists to support a theory of self-defense, it is an abuse of discretion for the trial court to refuse to give the instruction. *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997). The trial court's ruling on whether to give an instruction may be affirmed on any basis in the record. *People v. Mulvey*, 366 Ill. App. 3d 701, 711 (2006).

¶ 21     Here, as noted, defendant was charged with aggravated battery. See 720 ILCS 5/12-3.05(d)(4) (West 2020). A battery is aggravated when, as here, the victim is a "peace officer" "performing his or her official duties." *Id.* § 12-3.05(d)(4)(i). A peace officer may use any force he reasonably believes is necessary to defend himself from the defendant while performing his duties. See *People v. Freneey*, 2016 IL App (1st) 140328, ¶ 29. If the officer uses excessive force, the defendant is justified in using force to resist and may raise self-defense. *Id.* Thus, "a jury instruction on self-defense is required where the defendant is unaware of the [peace] officer's identity or there is evidence that the *** officer used excessive force." *People v. Ammons*, 2021 IL App (3d) 150743, ¶ 21.

¶ 22    Defendant's claim that the jury should have received a self-defense instruction has many problems. We address four of them. First, defendant suggests that he was entitled to a self-defense instruction because he did not know that Hassler was a corrections officer. See *People v. Williams*, 267 Ill. App. 3d 82, 88 (1994). We disagree, as the record does not contain any evidence to support defendant's claim. See *id.* at 89. Defendant's encounter with Hassler occurred in a jail, where people charged with or convicted of crimes are housed. The jail area where the incident occurred was a pod consisting of four cells. The pod was self-contained and secured. Only people with a key card, like Hassler, could open the door to the pod. Also, as defendant acknowledged, his cell was locked, preventing free entry and exit.

¶ 23    While waiting for the door to be unlocked remotely, Hassler used his radio to relay information using law enforcement codes. Hassler was dressed in his official uniform, which was the same uniform the other officers who helped restrain defendant were wearing. Defendant testified that Hassler had come to collect his food tray. After noticing the paper covering the window on the cell door, Hassler ordered defendant to take it down, explaining to defendant that he needed to see what was going on inside defendant's cell. This evidence clearly establishes that defendant was aware that Hassler was a corrections officer. Indeed, defendant on direct examination used the term "Officer Hassler," stated that "[h]e probably knew me better than I know him," stated that he put up the paper because "I wanted to talk to the officer, any officer" about "being fired from the kitchen." Defendant then admitted on cross-examination that Hassler possibly was a corrections officer. He also testified that an officer would come to check on him about once every thirty minutes.

¶ 24    Second, nothing in the record suggests that Hassler was the aggressor or that any force Hassler used was either excessive or unlawful. The evidence showed that an inmate covering a

window on a cell door violated jail policy. Defendant had covered his cell-door window with paper to indicate that he was "on strike." When Hassler noticed during the cell checks that defendant was violating this policy, he ordered defendant to remove the paper, explaining to defendant that he needed to be able to see inside his cell. Defendant refused to follow this order and asked Hassler not to touch the paper. At that point, Hassler ripped the paper off the window and tried to close defendant's cell door. Defendant prevented Hassler from doing so. He placed part of his body in the door frame and pushed against the door. As defendant forced his way out of the cell, he pushed against Hassler's face and then appeared to grab his neck or collar. The only force Hassler used was to pull away from defendant's hold on his neck or collar and then try to restrain defendant by grabbing his sweatshirt and arms. Their tussling was part and parcel of Hassler's attempt to defend himself against defendant and push him back into his cell. The evidence simply does not indicate that the amount of force Hassler used was excessive and disproportionate to the force needed to enforce the jail's rules and maintain control of inmates. See *Freneey*, 2016 IL App (1st) 140328, ¶ 31.

¶ 25    Third, defendant's self-defense claim is illogical. Self-defense is an affirmative defense. See *id.* ¶ 30. "An affirmative defense has the legal effect of admitting that the acts occurred but denying legal responsibility for them." *Id.* ¶ 32. Here, although defendant initially testified that he pushed Hassler away from him after Hassler touched him and that he was afraid that Hassler was going to harm him, he later testified repeatedly that he did not intentionally touch Hassler. While the recordings confirm that defendant pushed Hassler, consistent with defendant's initial testimony, defendant cannot argue on the one hand that he never touched Hassler and argue on the other that he justifiably pushed him. See *id.* ("Self-defense is an all-or-nothing proposition.").

¶ 26 Although, as noted, neither conflicting evidence nor impeached testimony is precluded from consideration in assessing whether a defendant presented "slight" evidence to support a self-defense theory, neither of the cases defendant cites for this proposition involves instructing the jury on self-defense where the defendant both denied committing the crime and claimed that his actions were justified. See *French*, 2020 IL App (3d) 170220, ¶¶ 4-5, 23 (trial court should have instructed the jury on self-defense in first-degree murder case when the defendant, who never denied killing the victim, (1) stated during an interrogation that he intended only to harm the victim, did not believe the victim was armed, and was angry the victim had threatened the defendant's friend; but (2) testified at trial that he was afraid the victim, who he believed reached for a weapon, was going to kill or seriously harm him, his friend, or his friend's mother); *Sims*, 374 Ill. App. 3d at 435 (self-defense instruction should have been given in battery and resisting arrest case when the defendant, who never specifically admitted kicking the officers, acknowledged that he was " 'pretty feisty' " and " 'struggled' " with the officers after they put him face down and began hurting him). We refuse to extend this principle here when the conflicting evidence and impeached testimony concerns whether defendant committed aggravated battery, *i.e.*, touched Hassler at all.

¶ 27 Fourth, even if defendant met the evidentiary threshold for a claim of self-defense against excessive force, the trial court still properly rejected a self-defense instruction. Assuming defendant had met his burden, the State needed to negate beyond a reasonable doubt only one of the six self-defense factors to prevent the jury from receiving a self-defense instruction. Here, the State negated the first two factors. Specifically, the State showed that Hassler's force against defendant was not unlawful but in response to defendant's physical aggression after Hassler removed the paper covering the cell-door window and told defendant why he could not cover the

window. Further, defendant initiated the physical altercation. When Hassler attempted to end his interaction with defendant by closing the cell door, defendant did not retreat into his cell. Rather, he prevented Hassler from closing the door, pushed against the door, and advanced toward Hassler once the door was opened.

¶ 28 Given all the above, we conclude that the trial court did not abuse its discretion when it refused to instruct the jury on self-defense. Because the trial court did not abuse its discretion, we do not address the parties' arguments on whether the failure to give the instruction was harmless beyond a reasonable doubt.

¶ 29                                        III. CONCLUSION

¶ 30 For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 31 Affirmed.