# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *People v. French*, 2020 IL App (3d) 170220

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRADLEY M. FRENCH, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-17-0220 |
| Filed | January 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 15-CF-224; the Hon. Howard C. Ryan Jr., Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Alexander G. Muntges, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Karen Donnelly, State's Attorney, of Ottawa (Patrick Delfino, Thomas D. Arado, and Richard T. Leonard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.

Justices Schmidt and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Bradley M. French, appeals his conviction for first degree murder, arguing the court should have instructed the jury on self-defense.

¶ 2                              I. BACKGROUND

¶ 3    An indictment charged the defendant with three counts of first degree murder. 720 ILCS 5/9-1(a) (West 2014). The case proceeded to a jury trial. The State's evidence established that on June 21, 2015, at approximately 5:30 a.m., officers responded to a 911 call regarding a disturbance at the Illinois Valley Community College (IVCC) parking lot. Joshua Scaman was lying on the ground, unconscious. The defendant was crouched near Scaman's head, with his hands on Scaman's chest. The defendant had injuries to his right forearm, smaller abrasions on his left lower leg, and marks on his lower back. He also had bloodstains on his face, right forearm, right leg, shirt, and shorts. Rachel Milton was also in the vicinity. The defendant told the officers that he had stabbed Scaman with an arrow. There was blood on Scaman's shirt and pooling underneath him on the asphalt. The officers attempted to put pressure on Scaman's injuries. While doing so, Scaman stopped breathing and the officers could not find a pulse. They began to do chest compressions. Oglesby medical personnel arrived and took Scaman to the hospital, but his pulse never returned. The arrow wound to the abdomen caused Scaman to bleed to death. Pieces of arrows with bloodstains, an unloaded handgun, and cigarettes with bloodstains were recovered from the defendant's vehicle. At approximately 12 p.m. later that day, an officer found a bow along the road about ⅛ to ¼ mile from the crime scene.

¶ 4    Lieutenant David Guinnee and Sergeant Michael Padilla interviewed the defendant, which was recorded. The defendant sat in the booking room for approximately 10 hours before his interview. Padilla read the defendant his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). The State played a video recording of the interview in court. At some point in the interview, the defendant stated that after speaking with Scaman, he drove to meet him. The defendant took his bow for protection. He told Rachel that he would shoot Scaman with the arrow if necessary. Scaman told the defendant that he would kill him and Rachel, which made the defendant angry. After the defendant shot Scaman with the arrow, the defendant and Scaman had a physical struggle, and the defendant hit Scaman with the bow and knocked him to the ground. After doing so, he told Rachel to hide the bow. The defendant told the officers that Scaman did not have any weapons. He only intended to wound Scaman, not kill him, but knew that shooting him with the bow could kill him. The State rested.

¶ 5    The defendant testified that at the time of the incident he was 21 years old. On June 20, 2015, he was at a bar from approximately 8:30 p.m. or 9 p.m. until about 2 a.m. on June 21. During this time, he consumed six to eight beers. Shortly after 2 a.m., while he was in the bar parking lot, he received a phone call from Rachel, who was a close friend. Rachel was crying and asked the defendant if she, her brothers, and her mother, Amanda, could come to his house. The defendant said, "I was like, yeah, sure. Why? What's up? And she had told me that Mr.

Scaman had thrown, or had beaten [Amanda] in front of their youngest son at a bonfire, or party, or something." The defendant did not know who Scaman was at that time. The defendant told Rachel they could come to his house, and he left the bar. When he arrived home, they were already there. The defendant observed that Rachel's face was "beet red from crying. Her eyes were red. She *** [was] shaking uncontrollably. And *** she had a look of fear in her eyes." He said, "Amanda was kind of shaken. *** She had marks around her neck. I couldn't tell what they were; but I seen that she had red marks around her neck. *** [S]he acted kind of skittish toward me when I walked up and introduced myself." Rachel's younger brother "acted upset" and "hung back in the background."

¶ 6     The defendant went outside to drink a beer and smoke a cigarette. Rachel came outside and told him "how [Scaman] had beaten Amanda that night at the party in front of the youngest boy." Rachel also told the defendant that Scaman had tried to sexually assault her on a previous occasion. Amanda then walked outside and told the defendant, "yeah, he did try to sexually assault Rachel. And that he was beating [Amanda] that night. And then she had went into their past about how [Scaman] used to drink; get angry; and beat up on Amanda."

¶ 7     Scaman began calling Amanda's phone, and the defendant could hear a male voice screaming, "If you don't come back, I'm going to fuckin' kill you." He also heard the man scream, "who's the guy that you're F'ing now and *** having, trying to play daddy to my kids." Amanda said, "no, nothing has happened" and hung up the phone. Scaman called back and screamed, "who's the guy you're F'ing now." The defendant told Amanda to give him the phone, which she did. The defendant got on the phone and introduced himself. Scaman said, "oh, so this is the POS that's trying to F my wife." Scaman then said, "if I don't see them within the next hour, I'm going to come down there and find you and kill you." The defendant then said, "if you can come down here and talk about this like a normal adult, you can." He then gave Scaman his address. The defendant stated that he was not trying to pick a fight, but was trying to calm Scaman down, stating, "I was just trying to diffuse the situation; trying to figure out why he was trying to accuse me of sleeping with his wife when I had never met her. And, you know, trying to play daddy to his kids that I had never met." When the defendant gave Scaman the address, Rachel and Amanda looked at him and their faces showed "pure fright." Scaman called back and said, "I'm really going to come down and find you and fucking kill you; and I'm going to kill them." The defendant responded that he would kill Scaman. The defendant then said, "I'll come up to your house and talk to you if you can talk like a normal person." Scaman said, "good; save me the F'ing gas." After he hung up the phone, the defendant told Rachel that he was going to go. Rachel said that she thought Scaman would have a weapon and told the defendant to bring one, so he retrieved his bow from the garage. The defendant stated that, even though he had guns in the house, he thought the bow would be "big and menacing." He "had no intentions of harming [Scaman]," so he did not take a gun and ammunition. Rachel got into the car to go with him. The defendant still had Amanda's phone, and Scaman called it again and told the defendant how to get to his house. The defendant said, "I'll come up there and meet you; but you're talking to me like a regular adult." Scaman said, "F that. I'm going to F'ing kill you. And I'm going to kill whoever you bring up here." Scaman had heard Rachel talking in the background.

¶ 8     The defendant went back to his house and retrieved a handgun, but no ammunition. He told Rachel that if something happened to the defendant "she could use it as a scare tactic." Scaman called again, and the defendant "felt uncomfortable about meeting" him, so the defendant told

Scaman that he was not coming to his house. "Rachel had just said that [Scaman was] very dangerous and *** would probably have a weapon."

¶ 9 Scaman called back and overheard the defendant tell Rachel that he was going to pull into the IVCC parking lot to urinate. Scaman said, "okay, I'll meet you there." The defendant pulled into the parking lot and exited the car to urinate. He intended to go to the bathroom and then leave. He told this to Rachel who said that Scaman was on his way and was going to have a weapon. The defendant told Rachel to lock herself in the car. As he was urinating in the grass, he heard tires squealing and saw a Jeep pull into the parking lot. The defendant did not expect Scaman to arrive so quickly. He heard Scaman open the Jeep door, run over to the defendant's car, and start banging on the window. The Jeep was still running, and the lights were on. The defendant was scared. He saw Rachel cowering in the passenger seat while Scaman pounded on the window yelling, "where's [the defendant]? I'm going to F'ing kill him; and then I'm going to F'ing kill you." He said this multiple times. The defendant began walking toward his car with his bow and attempted to get an arrow out of the quiver. The defendant broke the first arrow. The defendant said, "I was honestly scared for Rachel and myself, after he had said he was going to kill us many times." He threw the pieces of the arrow on the ground. He then succeeded in removing an arrow. He said, "I had it notched; and I had it pulled back a little bit. But, as I said, it was pointed down at the ground. And I had then said—I didn't yell. I told Mr. Scaman, just to where he could hear me, to get the F away from my car and [Rachel]."

¶ 10 Scaman turned toward the defendant and had both of his fists clenched. They were about seven to eight feet apart, but Scaman was striding toward the defendant. Scaman said, "so, you're the POS that's been sleeping with my wife," which the defendant denied. Scaman was screaming and his "face was red; and he was *** spitting when he was yelling." This was the first time the defendant had ever met Scaman. Scaman told the defendant that he was going to kill him. Scaman looked down at the defendant's bow and said, "You better have the balls to use it, or I'm going to take it and I'm going to use it on you and then her." The defendant stated, "After that, *** he had lunged at me. And as he was lunging at me, he was putting his right hand around by his hip, like side area." The defendant thought Scaman was reaching for a weapon. At that point, the defendant "knew that [Scaman] was actually serious and *** could [kill him]." The defendant believed that Scaman would kill or cause great bodily harm to him and Rachel. As Scaman lunged, the defendant "had just raised the bow as quick as [he] could; pulled it back and fired." Scaman grabbed the defendant's arm, and then they both fell back into a truck that was in the parking lot. The defendant pushed Scaman toward the Jeep to get Scaman off of him. The defendant saw the arrow that he had shot on the ground near the Jeep, so the defendant thought that he had not hit Scaman. Scaman began advancing on the defendant again, and the defendant backed away. The defendant told Scaman four or five times to get back in his Jeep and leave. Scaman looked at the defendant with a look of hate in his eyes. The defendant said, "I had actually stumbled and fell onto my knee. And he had actually come up and grabbed my forearm again. And that was when I *** hit him with the bow; and he went down." The defendant tossed his bow to the side and went to check on Scaman. He lifted up Scaman's shirt and saw he had a wound. The defendant attempted to put pressure on the wound to get the bleeding to stop.

¶ 11 The defendant told Rachel to call 911. He could not find his cell phone, so he went back to the car with the bow and broken arrows. He threw the arrows in the car and told Rachel to hide the bow. He then went back to put pressure on Scaman's wound and hold his head up so he

- 4 -

could breathe. Rachel then drove off in the car and was gone for two or three minutes. After she returned, the first officer arrived. He said at that point he was in a fog trying to comprehend everything that had happened. He did not remember being put in the squad car, but he remembered sitting in the car with handcuffs on thinking "what just happened."

¶ 12    The defendant presented two witnesses who testified to his character for peacefulness. Two witnesses testified that Scaman had a penchant for violence. Scaman had four prior convictions for battery and two convictions for resisting a peace officer. The defendant did not have any prior convictions.

¶ 13    Amanda testified that Scaman was her fiancé and the father of her two sons. On the night of June 20, she was at a bonfire with Scaman and her youngest son. Scaman had consumed "[q]uite a bit" of alcohol, was intoxicated, and became "enraged." Scaman thought that Amanda had kissed a woman at the bonfire. He yelled at her, "grabbed [her] by the front of [her] hoodie and he threw [her] across the yard." Amanda tried to calm Scaman down and tell him that nothing had happened, but "he kept pushing [her] and kept throwing [her]." He did this four to six times. At one point, Amanda looked over and saw her son watching with a "horrified look on his face." Since Scaman drove her to the bonfire, she and her son fled on foot around 1 a.m. on June 21. Before she left, she called Rachel to come pick them up on the road, which she did. They first went to Amanda's house to get her other son and then went to the defendant's house. Amanda had never met the defendant before but knew that he was Rachel's friend.

¶ 14    While they were gone, Scaman repeatedly called Amanda's phone. At first she did not answer, and he left voice messages. The defendant was sitting outside, and Amanda went outside to thank him for taking them in and explain the situation. Amanda told the defendant what had happened at the bonfire that night. Amanda told the defendant that it was a "pattern" that Scaman would become violent when he consumed alcohol. Amanda finally answered the phone the next time Scaman called. Scaman said, "where the fuck are you at." Scaman was screaming at her, and she tried to calm him down. Scaman told Amanda that she could not take his kids away from him. He said, "You have thirty minutes to walk through this door or else." Amanda said, "Or else what?" Scaman replied, "stop pushing me, bitch, or you'll find out." Scaman then said, "I don't care who you are fucking. I don't care who you sleep with. But nobody is going to play daddy to my kids. *** I will tell you this right now. I will bury my sons in a field. I would rather see them dead than let somebody play daddy to my kids."

¶ 15    The defendant told Amanda to let him talk to Scaman. The defendant said to Scaman, "I'm a friend of Rachel. Everything is fine. *** [S]he's just calming down for the night. She'll bring the boys home tomorrow. Nothing is going on." Scaman screamed "who the fuck are you? You're fucking my wife." The defendant laughed and told Scaman "I just met your wife. I'm not fucking her." Amanda described the defendant's demeanor as calm. She said he was not mad and was trying to calm Scaman down. Scaman then said, "I'm going to kick your fucking ass. I'm going to kill you." The defendant told Scaman to come to his house and gave him the address. Amanda stated, "I panicked. I looked at [Rachel] and I said we gotta go. Get your brothers. We gotta go. He's coming here. We gotta go."

¶ 16    After continuing the conversation with Scaman, the defendant got "agitated" and said, "alright, mother fucker, I'm on my way." The defendant and Rachel got into the car and left. Approximately 10 minutes later, they came back, and the defendant was laughing again and was not mad. Rachel told Amanda that Scaman wanted the defendant off of Amanda's phone

so he got his own phone. The defendant and Rachel left again, and she did not see them again that night. Amanda stated, "Myself and my children have always been told not to talk to the police; call the police; have any interaction to do with the police against [Scaman]; or there would be hell to pay afterwards." Amanda said they never talked about harming Scaman.

¶ 17    The parties discussed jury instructions. The defendant asked the court to include an instruction on self-defense. The court declined to give the self-defense instruction but stated that it would give a second degree murder instruction based on imperfect self-defense. The jury instructions included,

"The defendant has the burden of proving by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of Second Degree Murder instead of First Degree Murder.

By this, I mean that you must be persuaded in considering all the evidence in this case, that it is more probably true than not true that the following mitigating factor is present:

That the defendant, at the time he performed the acts which caused the death of Joshua Scaman, believed the circumstances to be such that they justified the deadly force he used, but his belief that such circumstance existed was unreasonable."

The jury ultimately found the defendant guilty of first degree murder, and he was sentenced to 30 years' imprisonment.

¶ 18                                              II. ANALYSIS

¶ 19    On appeal, the defendant contends that the court erred by failing to give a jury instruction on self-defense. Because the defendant presented some evidence to support a self-defense theory, the court erred in failing to give a jury instruction on self-defense.

¶ 20    "It has long been the position of [our supreme court] that a defendant is entitled to instructions on those defenses which the evidence supports. This is so even in instances where the evidence is 'slight' [citations] or where it is inconsistent with defendant's own testimony [citations]." *People v. Everette*, 141 Ill. 2d 147, 156 (1990). "An instruction for self-defense is given in a homicide case where there is some evidence in the record which, if believed by a jury, would support a claim of self-defense." *Id.* at 157. "The determination of whether the defendant's subjective belief is reasonable is for the jury to make." *People v. Lockett*, 82 Ill. 2d 546, 552 (1980). " 'Evidence, however slight, supporting an affirmative defense entitles the defendant to an instruction [citations], even if the evidence is conflicting and the defendant's testimony is impeached.' " *People v. Sims*, 374 Ill. App. 3d 427, 432 (2007) (quoting *People v. Swartz*, 186 Ill. App. 3d 399, 401 (1989)). Such evidence need not be credible as "[r]equiring that credible evidence exist in the record risks the trial court invading the function of the jury and substituting its own credibility determination for that of the jury." *People v. McDonald*, 2016 IL 118882, ¶ 25. "[W]hen the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *Id.* ¶ 42.

¶ 21    In order to instruct the jury on self-defense, the defendant had to establish some evidence of each of the following elements: (1) unlawful force was threatened against the defendant, (2) the defendant was not the aggressor, (3) the danger of harm was imminent, (4) the defendant actually and subjectively believed a danger existed that required the use of force,

and (5) the defendant's beliefs were objectively reasonable. *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995).

¶ 22     Here, the defendant provided some evidence to support each of the elements. First, Scaman threatened to kill the defendant, Amanda, Rachel, and the two boys on multiple occasions. While on the phone with Amanda, Scaman yelled, "I'm going to fuckin' kill you." When the defendant began speaking on the phone, Scaman said, "I'm really going to come down and find you and fucking kill you; and I'm going to kill them." When they arrived at the IVCC parking lot, Scaman ran out of his Jeep and began yelling, "I'm going to F'ing kill him." Scaman strode towards the defendant with his fists clenched. Scaman saw the defendant's bow, he said, "You better have the balls to use it, or I'm going to take it and I'm going to use it on you and then her." Second, the defendant presented some evidence that he was not the aggressor. After yelling at the defendant and running toward the defendant's car, the defendant testified that Scaman lunged at the defendant and reached toward his hip, as though reaching for a weapon. In response, the defendant "had just raised the bow as quick as [he] could; pulled it back and fired." Even after that, Scaman grabbed the defendant twice before the defendant hit him with the bow. Third, the defendant's testimony that Scaman had lunged at the defendant and looked like he was reaching for a weapon provided an imminent danger of harm. Amanda and Rachel had told the defendant that Scaman had beaten Amanda, had tried to sexually assault Rachel, and was violent. Rachel repeatedly told the defendant that Scaman likely would have a weapon.

¶ 23     Fourth, the defendant testified that he believed that Scaman was going to kill or cause great bodily harm to him and Rachel and thought that Scaman had a weapon. Through his testimony, the defendant provided evidence that he feared for his life and believed that self-defense was necessary. Such evidence was bolstered by the testimony of Amanda and two other witnesses that Scaman was a violent man, as well as his four previous convictions for battery and two convictions for resisting a peace officer. Thus, the defendant provided some evidence that he actually and subjectively believed that a danger existed that required the use of force. Once the defendant presented all this evidence, the fifth element is for the jury to decide. *Lockett*, 82 Ill. 2d at 552. Even though the defendant's testimony was impeached by his prior interrogation, the credibility determination should have been left to the jury.

¶ 24     Moreover, in *Lockett*, the circuit court gave the jury instruction on self-defense but refused to give the instruction on voluntary manslaughter based on an unreasonable belief of justification. *Id.* at 549-50. On appeal, our supreme court determined that the court should have given both instructions, stating:

> "A self-defense instruction is given in a homicide case when there is some evidence in the record which, if believed by a jury, would support a claim of self-defense. IPI Criminal No. 24.06, 'Use of Force in Defense of a Person,' provides in pertinent part:
>
> > '*** [A] person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent [imminent death or great bodily harm to (himself-another)] or [the commission of a forcible felony].' ***
>
> The jury, when given this instruction, could conclude one of three things. First, it could decide that the defendant did not have a subjective belief that use of force was necessary. In that case, the verdict should be murder. Second, it could determine that the defendant had the subjective belief that use of force was necessary and that

subjective belief was reasonable. In that event, the defendant's use of force was justified and the verdict should be not guilty. Third, a jury could conclude that the defendant subjectively believed that use of force was necessary, but that this subjective belief was unreasonable under the circumstances. The third alternative is the precise situation in which a verdict of voluntary manslaughter should be reached under section 9-2(b). IPI Criminal No. 7.05, 'Voluntary Manslaughter-Intentional-Belief of Justification,' provides:

'A person commits the crime of voluntary manslaughter who intentionally or knowingly kills another if, at the time of the killing, he believes that circumstances exist which would justify the killing, but his belief that such circumstances exist is unreasonable.' ***

Therefore, a self-defense and a voluntary manslaughter instruction should be given when any evidence is presented showing the defendant's subjective belief that use of force was necessary. If the subjective belief is reasonable, the result is justifiable use of force; if the subjective belief is unreasonable, the result is voluntary manslaughter. [Citation.]

The determination of whether the defendant's subjective belief is reasonable is for the jury to make." (Emphases omitted.) *Id.* at 551-52.

The court continued,

"It is not the province of the judge to weigh the evidence and decide if defendant's subjective belief was reasonable or unreasonable. The judge's duty is to determine if any evidence is presented that the defendant had a subjective belief. We can conceive of no circumstance when a judge could determine, as a matter of law, that a jury could find the defendant had a reasonable subjective belief the killing was justified, but that the jury could not find the defendant's subjective belief was unreasonable. So long as some evidence is presented from which a jury could conclude that defendant had a subjective belief, the jury should determine if the belief existed and, if so, whether that belief was reasonable or unreasonable. Consequently, we hold that when the evidence supports submitting an instruction on justifiable use of force, a tendered IPI Criminal No. 7.05 on voluntary manslaughter also should be given." *Id.* at 553.

Since *Lockett*, murder was renamed first degree murder, and second degree murder replaced voluntary manslaughter. See *Jeffries*, 164 Ill. 2d at 111-12.

¶ 25 The issue presented, here, is the converse of that in *Lockett*: while in *Lockett*, the court gave the self-defense instruction but not the voluntary manslaughter (now second degree murder) instruction; here, the court gave the second degree murder instruction but not the self-defense instruction. However, we find the reasoning in *Lockett* applies equally here. In giving the second degree murder instruction, the court obviously found that the defendant had presented evidence that he had a subjective belief that self-defense was necessary but then made the determination that such a belief was unreasonable. That determination should have been left to the jury. The jury should have been given the self-defense and second degree murder instructions so that they had the opportunity to determine whether they believed that the defendant had a subjective belief that the use of force was necessary and, if so, whether that belief was reasonable or unreasonable. The Fifth District reached the same conclusion in *People v. Russell*, 215 Ill. App. 3d 8 (1991).

¶ 26 In coming to this conclusion, we reject the State's contention that the court correctly refused the self-defense instruction because the evidence was overwhelming that the defendant was the aggressor. This argument ignores the principle that any evidence, however slight, is enough to necessitate a self-defense instruction. Here, the defendant's testimony provided some evidence that Scaman was the aggressor. It was up to the jury to determine its credibility.

¶ 27 Moreover, we reject the State's argument that any error was harmless. The entirety of the State's harmless error argument is:

> "Instructional errors are deemed harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed. *People v. Washington*, 2012 IL 110283, ¶ 60. Here, the jury was instructed on second degree murder but the jury found defendant guilty of first degree murder. This indicates that the jury did not believe that defendant reasonably believed he was justified in the use of deadly force against the victim. It follows that the jury would have likewise rejected a claim of self-defense by defendant."

First, the State cites no caselaw in which the failure to give a self-defense instruction amounted to harmless error. In *Washington*, our supreme court found that it was not harmless error for the court to fail to give a second degree murder instruction. *People v. Washington*, 2012 IL 110283, ¶ 60.

¶ 28 Second, we do not find that the State proved beyond a reasonable doubt that the failure to instruct the jury on self-defense did not affect the outcome of the proceedings. When considering whether an error was harmless, "courts of review must determine whether the trial court's error was harmless beyond a reasonable doubt. Harmless-error analysis is 'based on the notion that a defendant's interest in an error-free trial must be balanced against societal interests in finality and judicial economy.' " *People v. Mullins*, 242 Ill. 2d 1, 23 (2011) (quoting *People v. Simms*, 121 Ill. 2d 259, 275-76 (1988)). The State has the burden of proving "beyond a reasonable doubt that the constitutional error did not affect the outcome of the proceeding." *People v. McClanahan*, 191 Ill. 2d 127, 139 (2000).

¶ 29 In *People v. Harris*, 39 Ill. App. 3d 805, 811-12 (1976), the Fourth District found the failure to give a self-defense instruction in a similar situation not harmless error, stating,

> "As given here, the issues instructions on murder *** and voluntary manslaughter *** instructed the jury that if they found that defendant performed the acts which caused the death of deceased and that when defendant did so, he intended to kill or do great bodily harm to deceased, or knew that his acts created a strong probability of death or great bodily harm to deceased, they were to find defendant guilty of murder unless he had an unreasonable belief that deadly force was justified. Under these instructions, if the jury found that defendant intended to kill deceased and did kill him, but had a *reasonable* belief that deadly force was justified, they were offered no alternative but to find defendant guilty of murder." (Emphasis in original.)

¶ 30 We agree with *Harris*. Here, the jury was instructed that it first had to determine whether the State had proven each element of first degree murder beyond a reasonable doubt before it could determine whether a mitigating factor was present. The instructions stated that *only if* the jury found the elements of first degree murder were met could they go onto determining whether a mitigating factor was present so that the defendant would be guilty of the lesser included offense of second degree murder. The instructions then stated that the defendant was guilty of second degree murder if the elements of first degree murder were met but he had an

unreasonable belief that the circumstances necessitated the use of deadly force. If the jury believed that he had a reasonable belief that the circumstances necessitated the use of deadly force, they had no option but to find him guilty of first degree murder.

¶ 31 Based on our finding that the court erred in failing to instruct the jury on self-defense, we reverse the defendant's conviction and remand for a new trial. Because we reverse and remand on this ground, we need not consider the defendant's alternative argument that the court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We take no opinion on the propriety of the court's questioning of the jury. However, we caution the court to strictly comply with Rule 431(b) on remand.

¶ 32                                                   III. CONCLUSION

¶ 33 The judgment of the circuit court of La Salle County is reversed and remanded for a new trial.

¶ 34 Reversed and remanded.