**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 220168-U

Order filed April 3, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0168 Circuit No. 19-CF-693 |
| THOMAS A. REBMANN JR., | ) ) ) | Honorable William S. Dickenson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HETTEL delivered the judgment of the court.
Justice Peterson concurred in the judgment.
Presiding Justice McDade specially concurred.

**ORDER**

¶ 1     *Held*:  Counsel did not provide ineffective assistance at trial.

¶ 2     Defendant, Thomas A. Rebmann Jr., appeals from his convictions for aggravated

discharge of a firearm, arguing that defense counsel provided ineffective assistance where he

abandoned a potentially meritorious claim of self-defense and failed to object to a key witness's

prior statements. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          On October 4, 2019, the State indicted defendant on two counts of aggravated discharge

of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)) stemming from a September 16, 2019,

shooting near a school bus preparing to unload children. When defense counsel entered the case

on February 22, 2021, all previously tendered discovery was given to him, including the

disclosure of a potential witness, Tolina Shannon, along with a transcript of her testimony in a

separate but related matter. Defendant filed a statement disclosing a claim of self-defense.

¶ 5          The case proceeded to a jury trial on January 24, 2022. Relevant to this appeal, Cameron

Curtis testified that he worked for the United States Postal Service. On the afternoon of

September 16, 2019, he was delivering mail on the 400 block of South Lincoln Avenue in

Kankakee. At that time, he observed "a silver Grand Prix, Grand Am style car" speeding

northbound down the street. Curtis observed a school bus driving southbound toward two

daycares. He indicated that the car was unable to pass due to the narrow roadway and stopped 15

to 20 feet in front of the school bus.

¶ 6          After the car and bus were stopped, a 5-foot-10 inch to 5-foot-11 inch tall Caucasian male

with blond hair that was buzzed on the side and short on the top exited the driver's side and

walked around the front of the car. Curtis heard the man yelling, "I told you mother fuckers to

get out of the way." Curtis observed the man pull out a handgun and fire "what [he] thought was

four rounds." The man was approximately 50 to 60 feet away from the bus when he began firing.

He fired in a southeastern direction, away from both the school bus and Curtis. Curtis testified

that the man appeared to be shooting in the direction of a residence which he knew to be

occupied by the Carmona family. The man "didn't appear to be" shooting at any person. Curtis

indicated that he was aware that the Carmona family was affiliated with the Latin Kings gang.

¶ 7    When the shooting began, Curtis had already passed the Carmona residence and was standing several houses north of that location. Curtis explained that he had not observed anyone outside the Carmona residence when he had walked past it. Curtis reiterated that the man had "definitely not" shot at the school bus. Curtis testified that children had been preparing to exit the bus when the shooting began, and he heard a daycare employee yell for the bus driver to exit the area. Curtis indicated that the children returned to the school bus which then drove south. Once the school bus passed the street, the man returned to his car and drove northbound.

¶ 8    Latonya Hill testified that she had been employed as a school bus driver for approximately 20 years. In September 2019, Hill drove morning and afternoon routes. When asked whether her afternoon route included South Lincoln Avenue in September 2019, Hill replied that she could not remember that date. She could recall recent events but did not remember anything regarding September 2019.

¶ 9    Hill did not recall writing on an incident report after her afternoon shift on September 16, 2019, that she had been dropping children off in the 400 block of South Lincoln Avenue. Neither did she recall giving a recorded interview to Kankakee Detective Kris Lombardi on September 17, 2019. Hill testified that she did not remember: (1) which street she turned from, (2) what she noticed as she attempted to drop off the children on South Lincoln Avenue, (3) that the bus was in the middle of the roadway dropping off children and a gray silver car approached her, (4) that the driver of the silver car was in a hurry but was blocked in by the school bus and could not have gotten around it, (5) that she noticed the driver was fidgety and agitated, (6) the closeness of the silver car to the school bus, (7) writing in her September 16 written statement that she observed seven males come from the side of a residence, (8) describing that residence, (9) that the men came from the left/east side of the street or what the driver of the silver car did when

3

they appeared, (10) yelling "no, no, no" at the driver of the car or that he responded with "move the fucking bus move the fucking bus," (11) that she observed the driver holding a gun or that he again told her to move the bus, (12) hearing a gunshot from the group of men near the residence after the driver told her to move the bus a second time, (13) the driver of the silver car shooting back at the group of men, (14) that the driver and the group were firing back and forth, (15) anything about how she drove out of the area, (16) describing the driver as a Caucasian male wearing shorts and a white tank top, (17) explaining that she kept her attention on the driver because he appeared "too fidgety," or (18) telling Lombardi all of these facts. She denied telling Lombardi that "about seven guys came from the side of the building and by that time the driver of the car that's by the bus *** gets out." On cross-examination, Hill testified that she did not remember police responding to the area. She also stated that during her employment as a bus driver, including the day of the incident, she had never found a bullet hole in her school bus.

¶ 10        The next day, defense counsel moved to strike Hill's testimony because she was not a competent witness. The State argued that she was a recanting witness. The court denied the motion to strike and found that Hill could be impeached with her prior inconsistent statements.

¶ 11        Officer Jack Klasey of the Kankakee Police Department testified that at approximately 3:30 p.m. on September 16, 2019, he responded to reports of a shooting in the 400 block of South Lincoln Avenue. He met with Hill and checked the occupants of the bus for injuries. Klasey spoke with Ruben and Martin Carmona outside of their residence and was directed to an area of the street north of the residence where he located six spent .45-caliber shell casings. Klasey was informed by anonymous witnesses that the car involved in the shooting was a silver sedan. Through the investigation, defendant became a person of interest. Klasey became aware that defendant's girlfriend, Veronica Ayala, owned a silver Grand Prix. On cross-examination,

4

Klasey testified that he was unsure whether Ruben was currently being prosecuted for the same event in another courtroom but indicated that could be the case.

¶ 12    The State played a previously admitted video recording from the school bus for the jury. The video depicted Hill driving the school bus. Two adults and several children were on the bus. The bus stopped, and a light-colored vehicle can be seen stopping abruptly. Hill shouted "No" several times and drove forward. A Caucasian male can be seen emerging from his car. Hill drove forward a short distance, stopped, and ducked down. Six gunshots can be heard. Hill drove forward again and contacted dispatch. She again yelled "No" toward the driver's side of the school bus. Hill informed dispatch that she had been involved in a crossfire.

¶ 13    Lombardi testified that he investigated the September 16, 2019, shooting on South Lincoln Avenue. He photographed the six shell casings that had been discovered on the street. Lombardi interviewed Hill on September 17, 2019. The interview was video recorded, which was admitted and published to the jury. The video depicted Hill telling Lombardi everything that she could not remember telling him when she had testified the day before. On cross-examination, Lombardi testified that he concluded that defendant was the man who could be seen exiting the silver car and raising his arm when shots were heard on the video. Lombardi also opined that the six bullet casings near that area belonged to defendant. He explained that bullet casings only travel approximately 10 to 20 feet. Any casings from shots fired by individuals near the residence could not have travelled 700 feet to the street.

¶ 14    Sergeant Timothy Klopp of the Kankakee Police Department testified that he provided Hill with a photographic array on September 20, 2019. The identification was video recorded and was played for the jury. In the video, Hill was shown six photographs. She took approximately 2½ minutes to study the photographs. She informed Klopp that she recognized numerous

5

features in one photograph but was not completely sure. Hill explained that "the hair, the beard, nose, eyes and neck [made her] believe that that was the driver but [she thought] he [was] thinner now." Hill identified the photograph of defendant as the man who fired the gun near the school bus on September 16, 2019.

¶ 15 Hill was recalled as a witness during defendant's case-in-chief. Defense counsel showed her a previously admitted written incident report from the Illinois Central School Bus company. The account recorded in the report was consistent with the oral account of events that she gave to Lombardi. Hill indicated that she began yelling "no" as she "looked ahead and seen around seven males come from the side of the house." The driver yelled for her to move the bus. Gunshots were fired. As she drove away slowly, she explained that "the Kings (as known as) from the house were still firing the guns." Hill acknowledged that the signature on the report appeared to be hers; however, she did not remember writing it. She denied that the report was in her handwriting, then admitted that it could be her handwriting, but she had no recollection of writing it.

¶ 16 Hill testified that she had no recollection of being shown an initial photographic array by Lombardi on September 17, 2019. Defense counsel showed her a copy of a lineup questionnaire from that day. Hill denied that the witness signature was hers and testified that she did not recall viewing any of those photographs previously. The array contained defendant's juvenile photograph. Hill did not identify defendant in the September 17 lineup.

¶ 17 Hill was shown the previously admitted bus video recording from September 16, 2019. She acknowledged that she appeared on the video but could not recall the incident. Hill was shown the videos of the September 20, 2019, photographic identification with Klopp and her September 17, 2019, interview with Lombardi. She again acknowledged that she appeared on the

6

video but did not recall participating in those events. Hill indicated that she did not recognize defendant from the day of the shooting, stating: "I never seen that face around town."

¶ 18         Lombardi was recalled as a witness. He testified that he administered the initial photographic lineup to Hill on September 17, 2019. She did not identify defendant's photograph on that date. When asked by defense counsel why Hill was called back for another photographic lineup several days later, Lombardi explained that the photograph of defendant in the September 17 lineup was from 2011 when defendant was a juvenile. The photograph included in the September 20 lineup depicted defendant as an adult.

¶ 19         Ayala testified that she was defendant's fiancée. At the time of the shooting, she and defendant lived together with their two children in the neighboring town of Chebanse, approximately 10 to 15 minutes from South Lincoln Avenue. She was working in Grant Park on the afternoon of September 16, while defendant was at home. Ayala testified that defendant did not have a driver's license. She admitted that she had owned a 2013 Grand Prix but testified that defendant did not drive that car.

¶ 20         During the jury instruction conference, defense counsel did not ask for the prepared instruction for self-defense to be given. The instruction was subsequently withdrawn. In closing, defense counsel argued that the State had not met its burden in proving that defendant had been the shooter, highlighting the lack of identification of defendant by the witnesses. Counsel highlighted Hill's failure to identify defendant in the initial photographic lineup and her hesitancy and uncertainty in identifying defendant in the second photographic lineup four days later. Further, defense counsel argued that no DNA or fingerprints from the shell casings had been presented, no registration number from the involved vehicle had been obtained, and the

7

admitted video recordings did not show defendant as the shooter that day. The jury found defendant guilty on both counts.

¶ 21    Defense counsel filed a motion for new trial, arguing in relevant part that the State had committed a discovery violation by failing to tender discovery related to the prosecution of Ruben Carmona for the same September 16, 2019, shooting. At a hearing, counsel argued:

> "They failed to provide us with the 412 and they're—yeah, and they're across the hall prosecuting Ruben Carmona, and I don't know who else in a case known as 2020-CF-813. I mean I have no idea how they think they can do that. I mean I really I don't. They—you know, that's a very material fact. They owed us a 412.
>
> You know, if you look at my 413—if you look at my 413, I said we might use self defense as an affirmative defense, but we don't even have the information to do that thanks to the State."

In response, the State explained that the only difference between the discovery in Ruben's case and the instant case was a transcript of testimony provided by Shannon in a separate but related nuisance hearing. In that testimony, Shannon indicated that she had observed Ruben shooting in the direction of the school bus. The State tendered this transcript along with Shannon's address and the identity of the court reporter who recorded the testimony on February 22, 2021, when defense counsel entered the case. Counsel acknowledged that he had received the transcript in question and "the transcript didn't hurt [them] in any way."

¶ 22    The court denied defendant's motion for a new trial. At a sentencing hearing, the counts merged, and defendant was sentenced to 13 years' imprisonment. Defendant appeals.

¶ 23                                  II. ANALYSIS

8

¶ 24         On appeal, defendant argues that he was deprived of the effective assistance of counsel where trial counsel abandoned a meritorious claim of self-defense and failed to object to the introduction of Hill's prior statements.

¶ 25                              A. Ineffective Assistance of Counsel

¶ 26         "Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois." *People v. Domagala*, 2013 IL 113688, ¶ 36. To succeed on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30. In order to demonstrate prejudice, a defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 27         To establish deficiency, "a defendant must overcome the strong presumption that the challenged action or inaction *** was the product of sound trial strategy and not of incompetence." *People v. Clendenin*, 238 Ill. 2d 302, 317 (2010). Actions that are considered matters of trial strategy are afforded great deference by the court and "are generally immune from claims of ineffective assistance of counsel." *People v. West*, 187 Ill. 2d 418, 432 (1999) "[A] reviewing court will *** mak[e] every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007).

¶ 28                       1. Failure to Pursue a Claim of Self-defense

9

¶ 29    Defendant first contends that Hill's statements, admitted as substantive evidence, provided strong evidence supporting his claim of self-defense which counsel unreasonably abandoned in favor of a theory that the State failed to prove defendant was the shooter in the face of strong identification evidence. Additionally, defendant asserts that, had the jury considered self-defense, a reasonable possibility exists that they may have acquitted defendant.

¶ 30    To raise a claim of self-defense, the record must contain some evidence, however slight, which, if believed by the trier of fact, would support the claim. *People v. French*, 2020 IL App (3d) 170220, ¶ 20.

> "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *People v. Lee*, 213 Ill. 2d 218, 225 (2004).

"Self-defense is an affirmative defense, meaning that unless the State's evidence raises the issue involving the alleged defense, the defendant bears the burden of presenting evidence sufficient to raise the issue." *People v. Everette*, 141 Ill. 2d 147, 157 (1990). If the State negates any of the enumerated elements, a defendant's claim of self-defense fails. *Lee*, 213 Ill. 2d at 225.

¶ 31    "Generally, counsel's decision to argue one theory of defense to the exclusion of another is considered trial strategy." *People v. Gill*, 264 Ill. App. 3d 451, 462 (1992). Here, defense counsel disclosed an intention to raise a claim of self-defense. At trial, counsel presented no argument or evidence to further that claim, opting instead to put forth the theory that the State had failed to prove defendant was the shooter. He specifically informed the court that he was not

10

asking the jury to be given the self-defense instruction that had been prepared by the State. Instead, counsel chose to attack the State's identification evidence. He relied heavily on the failure of the witnesses to identify defendant as the shooter outside of the second photographic lineup presented to Hill. Defense counsel argued that the length of time spent studying the photographs and Hill's lack of certainty rendered the only presented identification evidence insufficient, beyond a reasonable doubt, to prove defendant was the shooter. He further highlighted the lack of physical evidence, matching vehicle evidence, and video evidence to prove defendant was the shooter.

¶ 32     Assuming, *arguendo*, that defendant's claim of self-defense is viable, it remains reasonable trial strategy to avoid raising the claim as admitting to shooting in self-defense would be incompatible with counsel's theory that the State failed to prove defendant was the shooter. See *People v. White*, 2011 IL App (1st) 092852, ¶ 70. The fact that counsel's strategic decision to argue that the State failed to prove its case was ultimately unsuccessful does not render that decision unreasonable or his representation deficient. *Id.* Consequently, defendant's claim of ineffective assistance of counsel for failing to raise a claim of self-defense fails.

¶ 33     In coming to this conclusion, we reject defendant's argument that the record shows that defense counsel did not make a strategic decision to abandon his claim of self-defense but did so due to his mistaken belief that he did not possess all the discovery. Defense counsel does briefly indicate that he may have presented a self-defense claim but he did not possess all the information; however, the record clearly demonstrates that counsel reviewed all the tendered discovery, including the transcript of Shannon's testimony, and then disclosed his potential claim of self-defense. The record also reflects that counsel was not aware that Hill would testify inconsistently with her recorded statements. It is reasonable to presume that counsel opted to

11

change theories after observing the newly discovered weakness in the State's case. Accordingly, that single statement from defense counsel during argument on his posttrial motion is insufficient to overcome the presumption of sound trial strategy.

¶ 34                                    2. Unavailability of the Witness

¶ 35        Defendant argues that Hill's video recorded statements to police, as well as her written statements to the bus company, were testimonial in nature and required Hill be subject to cross-examination to be admissible. Defendant contends that due to Hill's complete memory loss regarding the incident, she was not sufficiently available for cross-examination to satisfy the confrontation clause. Therefore, defendant states that defense counsel should have objected to the admission of Hill's prior statements.

¶ 36        Relevant to this appeal, section 115-10.1 of the Code of Criminal Procedure of 1963 allows prior statements of a witness to be admitted as substantive evidence if (1) the statement is inconsistent with their trial testimony, (2) the witness is subject to cross-examination concerning the statement, (3) the statement narrates an event of which the witness has personal knowledge, and (4) the witness either acknowledges under oath that he or she made the statement or it is established that the statement was accurately recorded by videotape recording or similar device. 725 ILCS 5/115-10.1 (West 2018). Additionally, for the statements to be admissible, they must also satisfy the requirements of the confrontation clause. *People v. Dabney*, 2017 IL App (3d) 140915, ¶ 18.

¶ 37        The confrontation clause requires that criminal defendants have the right to confront the witnesses against them. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The confrontation clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent defense counsel desires. *People v. Leonard*,

12

391 Ill. App. 3d 926, 934 (2009). "[A] gap in the witness' recollection concerning the content of a prior statement does not necessarily preclude an opportunity for effective cross-examination." *People v. Flores*, 128 Ill. 2d 66, 88 (1989). "The confrontation clause is not violated when a witness appears, answers questions, and is cross-examined but is unable to remember previous events." *People v. Martin*, 408 Ill. App. 3d 891, 896 (2011).

¶ 38       Here, Hill appeared on multiple days to testify at trial. During the State's case-in-chief, Hill answered preliminary questions regarding her age and employment. When the questioning turned toward the events of September 16, 2019, Hill largely responded that she did not know or could not recall. At one point, she denied making a certain statement to Lombardi regarding seven individuals near the house. During cross-examination, she testified that she had never, at any point in her employment, found a bullet hole in her bus. The next day, defense counsel recalled Hill to testify in defendant's case-in-chief. When asked about her written statement to the bus company, Hill acknowledged her signature on the statement even though she had no recollection of writing it. She also acknowledged providing video recorded statements to the police even though she did not recall making the statements. Further, defense counsel was able to obtain a complete denial of Hill's identification of defendant as the shooter on September 16, 2019. When asked if she recognized defendant from that event, Hill unequivocally said she had "never seen that face" before.

¶ 39       Defendant argues that Hill answering a few preliminary questions and then failing to answer even the most rudimentary questions about the incident and her statements rendered her unavailable for cross-examination. In support of this contention, defendant relies on *In re Brandon P.*, 2014 IL 116653, ¶¶ 46-47, and *In re Rolandis G.*, 352 Ill. App. 3d 776, 778 (2004). We find these cases to be inapposite. Both cases involved a victim who, after answering a few

13

preliminary questions, refused to continue testifying or answer any further questions. Here, Hill answered every question asked from both the State and defense counsel over multiple days. While a significant portion of her testimony was that she did not know or could not remember the answers, defense counsel was able to elicit substantive information from her. We find Hill's appearance at trial and her willingness to answer any question asked of her provided defense counsel with an effective opportunity to cross-examine her. See *Leonard*, 391 Ill. App. 3d at 935-36 ("That [defendant] was not able to cross-examine [the witness] to the extent he would have liked does not rise to a violation of his right to confront [the witness]. [The witness]'s supposed gaps in memory, while making cross-examination of him challenging, did not preclude the opportunity for cross-examination."). Thus, any objection counsel may have made to the admission of Hill's statements on these grounds would not have been successful and defendant's claim of ineffective assistance of counsel on this issue fails.

¶ 40                                    III. CONCLUSION

¶ 41          The judgment of the circuit court of Kankakee County is affirmed.

¶ 42          Affirmed.

¶ 43          PRESIDING JUSTICE McDADE, specially concurring:

¶ 44          I concur with the majority's decision to affirm the circuit court's judgment, only because the case law appears to require it. I write separately to note the disingenuousness of precedents that facilitate a finding that defendant had an opportunity to effectively cross-examine Hill, despite the fact that her substantive testimony was that she did not know or could not remember any of the facts of the relevant incident. This is especially true where, as here, evidence which reasonably appears to lean toward being exculpatory cannot be explored or developed by the examination of an eyewitness.

14

¶ 45    I am aware that, as the majority points out, relevant case law provides that a witness's lack of recollection does not necessarily preclude an opportunity for effective cross-examination, (see *Flores*, 128 Ill. 2d at 88), and that a witness is subject to cross-examination "when he is placed on the stand, under oath, and responds willingly to questions." *United States v. Owens*, 484 U.S. 554, 561 (1988). However, I disagree with this case law to the extent it finds it is possible for a defendant to effectively cross-examine a witness whose testimony consists almost exclusively of reiterating that she has no recollection of any of the events relevant to the charged offense. It does, however, so conclude, and so I concur.